1 | GARY P. BURCHAM
BURCHAM & ZUGMAN
2 | California Bar No. 190780
964 Fifth Avenue, Suite 300
3 | San Diego, CA 92101
Telephone: (619) 699-5930
4 | E-mail: gburcham@sbcglobal.net

5 | Attorney for Edgardo Prado Castaneda

6

7

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

UNITED STATES OF AMERICA,        )    Case No. 09CR0826-GW
11                                )
         Plaintiff,               )
12                                )
v.                                )    **EXHIBITS IN SUPPORT OF**
13                                )    **DEFENDANT'S SENTENCING**
EDGARDO PRADO CASTANEDA,          )    **POSITION FOLLOWING REMAND**
14                                )
         Defendant.               )
15                                )
_____ )
16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "A"

AO 91    Case 2:09-cr-00826-GW   Document 1   Filed 07/30/09   Page 1 of 60   Page ID #:1
Rev. 11/82                        CRIMINAL COMPLAINT                    **ORIGINAL**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA | DOCKET NO. |
|---|---|
| v. | |
| Edgardo Prado Castenedan aka "Primo" | MAGISTRATE'S CASE NO. **09-1598M** |

FILED
CLERK, U.S. DISTRICT COURT
JUL 30 2009
CENTRAL DISTRICT OF CALIFORNIA
BY                DEPUTY

Complaint for violations of 18 U.S.C. § 922(a)(1)(A) and
21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)

| NAME OF MAGISTRATE JUDGE | UNITED STATES MAGISTRATE JUDGE | LOCATION |
|---|---|---|
| Honorable Charles F. Eick | | Los Angeles, CA |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| February 4, 2009 through April 15, 2009 | Los Angeles County | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

See Attachment "A"

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
    (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT |
|---|---|
| | Jason Van Bennekum |
| | OFFICIAL TITLE: Special Agent--Bureau of Alcohol, Tobacco, Firearms & Explosives |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE (1) | DATE |
|---|---|
| | July 30, 2009 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.
AUSA: SHAWN J. NELSON        REC: Detention

A T T A C H M E N T   A

COUNT ONE:   18 U.S.C. § 922(a)(1)(A)

On or about February 4, 2009, February 24, 2009, February 25, 2009, and April 15, 2009, in Los Angeles County, within the Central District of California, defendant EDGARDO PRADO CASTENEDA, aka "Primo" not being a licensed importer, licensed manufacturer, and licensed dealer, knowingly engaged in the business of importing, manufacturing, and dealing in firearms, namely,

(1)   an Armaalite Eagle Arms Model M15A2 5.56mm caliber rifle bearing serial number 38818;

(2)   an Olympic Arms, model MFR .223 caliber rifle bearing serial number 6009;

(3)   a Tanfoglio model Witness P .45 caliber pistol bearing serial number EA01155;

(4)   a Tanfoglio model EA .380 caliber pistol bearing serial number EA20334;

(5)   a Bersa model 383a .380 caliber pistol bearing serial number 248032;

(6)   a Ruger model Single Six .22 caliber revolver bearing serial number 435296;

(7)   a Taurus, unknown model, .38 caliber revolver bearing serial number 1814716;

(8)   a Remington, model 13T .22 caliber rifle bearing no serial number;

(9)   a Remington, model 14 .22 caliber rifle bearing no serial number;

(10)  a Marlin Model 39A .22 caliber rifle bearing serial number J12996;

(11)  a Harrington and Richardson model Huntsman .45 caliber rifle bearing serial number AJ268794;

(12)  a Ruger model Mark I .22 caliber pistol bearing serial number 11-02307;

(13)  a Ruger, unknown model .22 caliber pistol bearing serial number 113437;

(14)  a Ruger model Single Six .22 caliber revolver bearing serial number 506422;

(15) a Chinese made model AK-47 machine gun 7.62 caliber
     rifle serial number 8414837;

(16) a Ewbank manufacturing, Model EMAKM, 7.62 caliber AK-47
     type rifle with an obliterated serial number; and

(17) an AA Arms, TEC 9 type 9 millimeter caliber model AP9
     serial number 033237.

## COUNT TWO: 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)

On or about July 9, 2009, in Los Angeles County, within the
Central District of California, defendant EDGARDO PRADO
CASTENEDA, aka "Primo" knowingly and intentionally distributed
approximately 111.41 grams of a mixture or substance containing a
detectable amount of methamphetamine, a schedule II controlled
substance.

A F F I D A V I T

I, Jason Van Bennekum, being duly sworn, do hereby state the following:

INTRODUCTION

1.    I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been a Special Agent for approximately three and a half years.  Prior to working for ATF, I was a Border Patrol Agent in the U.S. Border Patrol for approximately eight years, where I routinely investigated violations of federal law, including narcotics offenses. As a SA for ATF, my duties include the investigation of violations of federal firearms, explosives, and narcotics laws.  As part of my training, I attended the Criminal Investigator and Special Agent Basic Training Academies for ATF in Glynco, Georgia, for approximately 26 weeks.  I regularly refer to state and federal firearms and narcotics laws and regulations during the course of my duties.

2.    I have also been a case agent in multiple investigations involving gang members and narcotics traffickers involved in carrying firearms in relation to drug trafficking offenses.  During my employment with ATF, I have participated in more than fifty investigations involving individuals illegally

1

possessing and/or selling firearms and narcotics. I am currently assigned to the ATF Van Nuys Field Office.

### PURPOSE OF THE AFFIDAVIT

3.    This affidavit is made in support of complaints and arrest warrants for Edgardo Prado Casteneda, aka "Primo" ("PRADO"), Vicente Garcia, Jr., aka "Chevy" ("GARCIA"), Steven Scott Blanks ("BLANKS"), and Victor Velasquez, aka "Fingers" ("VELASQUEZ"). This affidavit is also made in support of search warrants for the residence of PRADO (SUBJECT PREMISES 1, more fully described below), the residence of Garcia (SUBJECT PREMISES 2, more fully described below), the residence of Blanks (SUBJECT PREMISES 3, more fully described below), and the residence of Blanks' girlfriend (SUBJECT PREMISES 4, more fully described below). This affidavit is also made in support of search warrants for two vehicles belonging to PRADO (Subject Vehicle 1, and Subject Vehicle 2, more fully described below).

4.    This affidavit is intended to show there is sufficient probable cause for the requested complaints, arrest warrants and search warrants. It does not purport to set forth all of my knowledge of or investigation into this matter. The statements set forth in this affidavit are based upon my background, training and experience, my review of reports related to this case, my review of field notes related to this case, my

2

debriefings with the confidential informant and undercover agent,
my conversations with other involved personnel, my review of
electronic surveillance, my own personal observations and other
reliable sources of information relative to this investigation.

### PREMISES TO BE SEARCHED

5.     The premises to be searched are described in Attachment
A and are described as follows:

a.     The premises known as 18408 East Bellefont Drive,
Azusa, California, including any attached or detached structures
on the property ("SUBJECT PREMISES 1").   SUBJECT PREMISES 1 is
further described as a one-story single family dwelling on the
south side of Bellefont Drive between Edenfield Avenue to the
east and Orangecrest Avenue to the west.   The residence at
SUBJECT PREMISES 1 is brown with brown trim.   A block wall with a
black gate encloses SUBJECT PREMISES 1.   The numbers "18408" are
painted on the curb directly in front of SUBJECT PREMISES 1.

b.     The premises known as 18335 East Bellefont Drive,
Azusa, California, including any attached or detached structures
on the property ("SUBJECT PREMISES 2").   SUBJECT PREMISES 2 is
further described as a one-story single family dwelling on the
north side of Bellefont Drive between Edenfield Avenue to the
east and Orangecrest Avenue to the west.   The residence at
SUBJECT PREMISES 2 is white with blue trim.   The front door of

3

SUBJECT PREMISES 2 faces south and is enclosed by a white wrought iron security door.  The numbers "18335" are displayed on a mailbox in front of SUBJECT PREMISES 2.

      c.    The premises of 4980 Bluff Street, Norco, California, including any attached or detached structures on the property ("SUBJECT PREMISES 3").  SUBJECT PREMISES 3 is a one-story single family residence on the north/west side of Bluff Street, which runs southwest from River Road to the northeast.  SUBJECT PREMISES 3 is light blue in color with a grey roof.  Red canopies hang above the windows on the front of SUBJECT PREMISES 3.  The numbers "4980" are displayed to the left of the front door of SUBJECT PREMISES 3, on the front of a red brick mailbox in front of SUBJECT PREMISES 3, and on the curb in front of SUBJECT PREMISES 3.

      d.    The premises known 4031 Temescal Avenue, Norco, California, including any attached or detached structures on the property ("SUBJECT PREMISES 4").  SUBJECT PREMISES 4 is a one story single family residence on the east side of Temescal Avenue north of Sixth Street.  SUBJECT PREMISES 4 is tan and white in color with a tan colored roof.  The front door of SUBJECT PREMISES 4 is red and the garage door is white.  The numbers "4031" are visible to the left of the front door.

      e.    A black 2007 GMC Yukon Denali with California

license plate 5WMB332 ("SUBJECT VEHICLE 1").

      f.   A white 2003 Chevrolet Trailblazer with California license plate 6FNU940 (SUBJECT VEHICLE 2").

<u>ITEMS TO BE SEIZED</u>

   6.   The items to be seized from SUBJECT PREMISES 1 are described in Attachment B and are as follows:

      a.   Firearms, including revolvers, pistols, rifles, shotguns, machineguns, and assault weapons;

      b.   Firearms accessories, including firearm magazines, silencers, destructive devices, gun cases, ammunition, ammunition magazines, holsters, and spare parts for firearms or firearms accessories;

      c.   Firearms money ledgers, firearms distribution or customer lists, price lists, firearms supplier lists, maps and written directions to locations, correspondence, notation logs, receipts, journals, books, pay and owe sheets, telephone records, telephone bills, address books, bank statements, storage unit receipts, wire transfer receipts, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

      d.   Controlled substances, including methamphetamine;

      e.   Substances used in the manufacture and packaging of methamphetamine including ephedrine tablets, acetone, red

phosphorous, iodine, and sodium hydroxide;

    f.   Equipment or tools used to manufacture, package, transport or sell methamphetamine, including scales, sifters, beakers, jars, heat sealers, heat sealable bags, zip-loc bags, paper bindles and baggies;

    g.   Narcotics money ledgers, narcotics distribution or customer lists, telephone and address books and lists, narcotics supplier lists, maps and written directions to locations, correspondence, telephone bills, notation logs, receipts, journals, books, pay and owe sheets, records, and other documents or devises noting the price, quantity, dates, and/or times when controlled substances were purchased possessed, transferred, distributed or sold; and

    h. Indicia of occupancy, residency, control and/or ownership of SUBJECT PREMISES 1, such as utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records, and rental bills.

    7.   The items to be seized from SUBJECT PREMISES 2 are described in Attachment C and are as follows:

    a.   Firearms, including revolvers, pistols, rifles, shotguns, machineguns, and assault weapons;

    b.   Firearms accessories, including firearm magazines, silencers, destructive devices, gun cases, ammunition, ammunition

magazines, holsters, and spare parts for firearms or firearms accessories;

      c.   Firearms money ledgers, firearms distribution or customer lists, price lists, firearms supplier lists, maps and written directions to locations, correspondence, notation logs, receipts, journals, books, pay and owe sheets, telephone records, telephone bills, address books, bank statements, storage unit receipts, wire transfer receipts, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold; and

      d. Indicia of occupancy, residency, control and/or ownership of SUBJECT PREMISES 2, such as utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records, and rental bills.

    8.   The items to be seized from SUBJECT PREMISES 3 are described in Attachment D and are as follows:

      a.   Firearms, including revolvers, pistols, rifles, shotguns, machineguns, and assault weapons;

      b.   Firearms accessories, including firearm magazines, silencers, destructive devices, gun cases, ammunition, ammunition magazines, holsters, and spare parts for firearms or firearms accessories;

      c.   Firearms money ledgers, firearms distribution or

7

customer lists, price lists, firearms supplier lists, maps and written directions to locations, correspondence, notation logs, receipts, journals, books, pay and owe sheets, telephone records, telephone bills, address books, bank statements, storage unit receipts, wire transfer receipts, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold; and

d. Indicia of occupancy, residency, control and/or ownership of SUBJECT PREMISES 3, such as utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records, and rental bills.

9. The items to be seized from SUBJECT PREMISES 4 are described in Attachment E and are as follows:

a. Firearms, including revolvers, pistols, rifles, shotguns, machineguns, and assault weapons;

b. Firearms accessories, including firearm magazines, silencers, destructive devices, gun cases, ammunition, ammunition magazines, holsters, and spare parts for firearms or firearms accessories;

c. Firearms money ledgers, firearms distribution or customer lists, price lists, firearms supplier lists, maps and written directions to locations, correspondence, notation logs, receipts, journals, books, pay and owe sheets, telephone records,

8

telephone bills, address books, bank statements, storage unit receipts, wire transfer receipts, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold; and

d. Indicia of occupancy, residency, control and/or ownership of SUBJECT PREMISES 4, such as utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records, and rental bills.

10. The items to be seized from SUBJECT VEHICLE 1 are described in Attachment F and are as follows:

a. Firearms, including revolvers, pistols, rifles, shotguns, machineguns, and assault weapons;

b. Firearms accessories, including firearm magazines, silencers, destructive devices, gun cases, ammunition, ammunition magazines, holsters, and spare parts for firearms or firearms accessories;

c. Firearms money ledgers, firearms distribution or customer lists, price lists, firearms supplier lists, maps and written directions to locations, correspondence, notation logs, receipts, journals, books, pay and owe sheets, telephone records, telephone bills, address books, bank statements, storage unit receipts, wire transfer receipts, and other documents or devises noting the price, quantity, dates, and/or times when firearms

9

were purchased possessed, transferred, distributed or sold;

    d.  Controlled substances, including methamphetamine;

    e.  Substances used in the manufacture and packaging of methamphetamine including ephedrine tablets, acetone, red phosphorous, iodine, and sodium hydroxide;

    f.  Equipment or tools used to manufacture, package, transport or sell methamphetamine, including scales, sifters, beakers, jars, heat sealers, heat sealable bags, zip-loc bags, paper bindles and baggies;

    g.  Narcotics money ledgers, narcotics distribution or customer lists, telephone and address books and lists, narcotics supplier lists, maps and written directions to locations, correspondence, telephone bills, notation logs, receipts, journals, books, pay and owe sheets, records, and other documents or devises noting the price, quantity, dates, and/or times when controlled substances were purchased possessed, transferred, distributed or sold; and

    h. Indicia of ownership of SUBJECT VEHICLE 1, including car registrations documents, car insurance documents and "pink-slips."

   11.  The items to be seized from SUBJECT VEHICLE 2 are described in Attachment G and are as follows:

    a.  Firearms, including revolvers, pistols, rifles,

shotguns, machineguns, and assault weapons;

       b.   Firearms accessories, including firearm magazines, silencers, destructive devices, gun cases, ammunition, ammunition magazines, holsters, and spare parts for firearms or firearms accessories;

       c.   Firearms money ledgers, firearms distribution or customer lists, price lists, firearms supplier lists, maps and written directions to locations, correspondence, notation logs, receipts, journals, books, pay and owe sheets, telephone records, telephone bills, address books, bank statements, storage unit receipts, wire transfer receipts, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

       d.   Controlled substances, including methamphetamine;

       e.   Substances used in the manufacture and packaging of methamphetamine including ephedrine tablets, acetone, red phosphorous, iodine, and sodium hydroxide;

       f.   Equipment or tools used to manufacture, package, transport or sell methamphetamine, including scales, sifters, beakers, jars, heat sealers, heat sealable bags, zip-loc bags, paper bindles and baggies;

       g.   Narcotics money ledgers, narcotics distribution or customer lists, telephone and address books and lists, narcotics

11

supplier lists, maps and written directions to locations,
correspondence, telephone bills, notation logs, receipts,
journals, books, pay and owe sheets, records, and other documents
or devises noting the price, quantity, dates, and/or times when
controlled substances were purchased possessed, transferred,
distributed or sold; and

       h. Indicia of ownership of SUBJECT VEHICLE 1, including
car registrations documents, car insurance documents and "pink-
slips."

### THE CONFIDENTIAL INFORMANT

    12.  The investigation of PRADO, GARCIA, BLANKS and
VELASQUEZ was part of a larger investigation of firearms and
narcotics sales in and around County of Los Angeles.  One
Confidential Informant ("the CI") was used during this
investigation.  The CI was involved in multiple undercover
purchases of firearms and/or methamphetamine from PRADO, GARCIA,
BLANKS and VELASQUEZ.

    13.  The CI has provided ATF with reliable information in
the past regarding various criminal activities, including the
unlawful sale of firearms and controlled substances.  Said
information has been independently corroborated.  The CI is known
to be a reliable informant to ATF.

    14.  In July of 2009, I performed records checks of the CI's

12

criminal history and noted that the CI had the following
convictions:  (1) on or about January 29, 1997, a misdemeanor
conviction for assault;  (2) on or about August 7, 1998, a
misdemeanor conviction for unlicensed driving;  (3) on or about
December 28, 1998, a misdemeanor conviction for driving under the
influence of alcohol; (4) on or about February 22, 2000, a
misdemeanor conviction for driving with a suspended license; (5)
on or about February 24, 2000, a misdemeanor conviction for
driving under the influence of alcohol; (7) on or about December
6, 2001, a misdemeanor conviction for unlicensed driving; and 8)
on or about October 26, 2004, a felony conviction for
sale/transport a controlled substance. 9) on or about January 1,
2006, a misdemeanor conviction for reckless driving.

     15.  The CI is a paid informant.  The CI has been paid
approximately $12,450.00 for subsistence by ATF related to this
investigation for his undercover work.  The CI has worked other
cases with ATF and was paid approximately $15,000.  The CI worked
at least two cases with the Drug Enforcement Agency and was paid
$35,000 for the two cases.  Additionally, as a result of the CI's
cooperation with the DEA, drug charges against the CI were not
filed.

     16.  In 2007, the CI worked with ATF on an investigation
involving firearms and methamphetamine sales by gang members in

the Santa Barbara area.   Information and evidence gathered by the CI was independently corroborated by audio and video surveillance and officers participating in the surveillance of the operations. ATF deemed the CI credible and truthful during the investigation.

17.   During this current investigation referenced in this affidavit, information and evidence gathered by the CI was independently corroborated by various sources including video/audio surveillance and observations of law enforcement personnel. ATF deemed the CI credible and truthful during this investigation.

### STATEMENT OF PROBABLE CAUSE

18.   On October 16, 2008, I met with the CI who told me the following:

a.   On Thursday October 16, 2008, the CI met with a person he knew as "Johnny." "Johnny was later identified as Jean Pierre Takeshi Santoy ("Santoy").

b.   The CI knew Santoy through common friends in the motorcycle community.   Santoy had previously introduced the CI to an individual known as "Chevy," later identified as GARCIA.   This introduction had taken place at GARCIA'S house at SUBJECT PREMISES 2.   Santoy told the CI that Garcia built motorcycles and was suspected of trafficking in stolen motorcycle parts.

14

c.    Santoy told the CI that Santoy had some firearms for sale.  Santoy gave the CI several photographs of firearms and explained that GARCIA had a cousin who owned a firearms store in Arizona and was bringing guns to California to sell.  The CI told Santoy that he would call him on Monday to let him know what he wanted to buy.

19.  On Monday October 20, 2008, I conducted an operation to purchase firearms from Santoy.  Based on my observations, my conversations with other involved agents, my conversations with and debriefing of the CI, and my review of electronic surveillance, I learned the following:

a.    I met with the CI.  The CI gave me the pictures of firearms that he got from Santoy.

b.    I directed the CI to call Santoy.  I listened as the CI called Santoy and arranged to meet at the Acapulco restaurant on Foothill Boulevard in Azusa ("Acapulco").

c.    I then equipped the CI with a monitoring and recording device.  I also issued the CI $3,000 in funds.  I searched the CI's vehicle and person and found no firearms.  The CI drove to Acapulco and picked up Santoy.  Santoy directed the CI to drive to SUBJECT PREMISES 2.  During the drive, Santoy told the CI that the firearms were in Santoy's van, which was parked in front of SUBJECT PREMISES 2.

15

d.   When the CI and Santoy arrived in front of SUBJECT PREMISES 2, they got out of the CI's car and entered Santoy's white van that was parked on the street in front of SUBJECT PREMISES 2.  The CI saw several bags of rifles and two or three pistols were in the van.  The CI also recognized that many firearms in the van were the same as those in the pictures that Santoy had provided to him.

e.   The CI asked Santoy about the prices for the firearms and Santoy called someone on his cellphone.  Santoy left the van and entered SUBJECT PREMISES 2.  Santoy returned to the van a few minutes later.  The CI and Santoy further negotiated prices.  The CI picked out three rifles and paid Santoy $3000 for the three rifles.

f.   The CI told Santoy that he would call him the next Thursday to purchase more firearms.  The CI then left from in front of SUBJECT PREMISES.  Santoy remained at the van.

g.   The CI met me at a predetermined location.  The CI gave me a Marlin Model 60 .22 caliber rifle bearing serial number 16398110, an Olympic Arms AR-15-type rifle bearing serial number B12789, and a Bushmaster model XM 15 (AR-15-type) rifle bearing serial number L040027.  The CI also returned the monitoring and recording device.

20.   On October 30, 2008, I conducted an operation to

16

purchase firearms from Santoy.  Based on my observations, my
conversations with other involved agents, my conversations with
and debriefing of the CI, and my review of electronic
surveillance, I learned the following:

      a.   The CI told me that he had asked around and found
out that the person he knew as "Johnny" (Santoy) was really John
SANTOY and that he lived at 2327 Maynard Drive, Duarte,
California.  (I later obtained a DMV photo of Santoy, and the CI
positively identified Santoy).

      b.   The CI told me that Santoy had stated that he had
a fully automatic "Uzi" for sale and a fully automatic M-11
firearm for sale.  Santoy stated that each firearm would cost
$1,400.  SANTOY further stated that he had a Bushmaster AR-15-
type firearm that he would give to the CI today and that the CI
could pay for it later.

      c.   I then met with the CI at a staging location.  I
search the CI and his vehicle and found no firearms.  I equipped
the CI with a monitoring and recording device and issued him
$2,800 in funds.

      d.   The CI left the staging location and drove to the
alley behind Santoy's house at 2327 Maynard Drive, Duarte,
California.  At about 12:37 p.m. the CI met with Santoy in
Santoy's garage at the rear of Santoy's property.  The CI

observed, in Santoy's garage, several of the firearms that the CI

had seen in Santoy's van on October 20, 2008.   Santoy loaded the

firearms from the garage into the CI's car.   The CI paid Sanoty

$2,800.   The CI then drove back to the staging area.

     e.    At the staging area, from the CI's car, I

recovered a Bushmaster model M17S .223 caliber rifle bearing

serial number P06724, a Norinco model 320 9mm caliber rifle

bearing serial number MSA09131, and a SWD model M-11 (UZI TYPE]

9mm caliber pistol bearing serial number 89-0002328.   The CI also

returned the monitoring and recording device.

     f.    I also viewed the recording and positively

identified Santoy as the person the CI met with on October 16,

2008.

     21.   On January 5, 2009, I conducted an operation to

purchase firearms.   During this operation the CI purchased

a .32 caliber, Llama pistol, model micro max bearing serial

number 71040854701 from Santoy.

     22.   On January 12, 2009, I met with the CI.   I directed the

CI to call Santoy about stolen cars and firearms.   I monitored a

phone call between the CI and Santoy in which they discussed

stolen cars.   The CI later met with Santoy and, at my direction,

purchased a stolen Porsche from Santoy for approximately $2,900.

(During this investigation, I also determined that Santoy was

involved in a car theft ring.  This car theft ring would obtain

high end cars from the owners, who generally wanted out of the

lease or contract.  The members of the ring would then use the

cars before they were reported stolen.  I believe some of these

cars were either then sent out of the country or were rebuilt

with different vehicle identification numbers.)  During this

transaction, Santoy stated that he had a Mini-14 rifle for sale.

23.  On January 21, 2009, I conducted an operation to

purchase firearms.  Based on review of the recording, my

observations, conversations with other involved agents and a

debrief of the CI, I learned the following:

a.  The CI told me that Santoy had called him about

several firearms.  They had agreed to meet in East Los Angeles.

Later that evening I conducted an undercover operation to

purchase the firearms.  However, Santoy's source was delayed and

the transaction did not occur.

24.  On January 27, 2009, I conducted an undercover

operation to purchase firearms.  Based on review of the

recording, my observations, conversations with other involved

agents and a debrief of the CI, I learned the following:

a.  The CI told me that Santoy had called him again

about firearms for sale and they discussed meeting in Rosemead

that evening.  I them met the CI at a staging location.

19

b.   I directed the CI to call Santoy.  I listened while Santoy told the CI that he had two firearms right now. The CI agreed to purchase them and got directions to meet Santoy.  I searched the CI and his vehicle and found no firearms.  I equipped him with a monitoring and recording device and issued him $400.

c.   The CI then drove to meet Santoy in the area of Alpaca street and Chico Avenue in South El Monte California.  Santoy was observed walking away from 9643 Alpaca Avenue, which is an industrial type building with a residence to the rear.  The CI and Santoy met in front of 9643 Alpaca.  Santoy told the CI that he only had two .22 caliber rifles and that the CI could have them for $300. The CI agreed.  Santoy walked into 9643 Alpaca and came back out with the firearms.  Santoy put the firearms in the CI's car.  The CI paid Santoy $300.

d.   The CI then drove back to the staging location.  The CI gave me a .22 caliber rifle of unknown manufacture, bearing serial number 51103, and a Colt model 20 .22 caliber rifle bearing serial number 23975441.  The CI also returned the monitoring and recording device and the unused funds.

25.  On January 28, 2009, I directed the CI to go to

20

SUBJECT PREMISES 2 and attempt to meet the person who lived

there, whom I suspected was one of Santoy's sources for

firearms.  Based on a debrief of the CI, I learned the

following:

        a.  The CI drove to SUBJECT PREMISES 2 and met

with GARCIA.  GARCIA was running a motorcycle shop out of

the garage of SUBJECT PREMISES 2.  The CI asked GARCIA about

building the CI a motorcycle.

        b.  After a short conversation, GARCIA asked the

CI if the CI was the person who had been buying firearms

through Santoy.  The CI told GARCIA that the CI had

purchased the firearms from Santoy.  GARCIA told the CI that

Santoy had not GARCIA'S supplier (whom GARCIA referred to as

"PRIMO," which is a Spanish term for cousin) for any of the

firearms.  The CI told GARCIA that he had paid Santoy for

all of the firearms and did not know why Santoy had not paid

GARCIA'S supplier.

        c.  GARCIA then called a person he referred to as

"PRIMO" (Later identified as Edgardo PRADO Casteneda).  A

short time later, PRADO arrived and met with the CI and

GARCIA.  PRADO stated that Santoy owed him $5,000 for the

firearms.  PRADO and the CI agreed that Santoy was

responsible for the price of the firaerms.  PRADO told the

CI that he could get any guns that the CI wanted and, from now on, to call GARCIA to arrange any future purchases of firearms. During the meeting, the CI saw a firearm in PRADO's waistband.

d.   After PRADO left, GARCIA told the CI that he wanted to get to know the CI better before performing any firearms transactions. GARCIA and the CI agreed that GARCIA would build a motorcycle for the CI, and if that went well, then they could do firearms transactions. The CI then contacted me and relayed the information concerning his meeting. The CI told me that over the next few days, GARCIA contacted him about the motorcycle.

26.   On February 4, 2009, I conducted an undercover operation to purchase firearms. Based on review of the recording, my observations, conversations with other involved agents and a debrief of of the CI, I learned the following:

a.   The CI told me that GARCIA had called him and told him that he had a Beretta and two AR-15s for sale. GARCIA told the CI that PRADO wanted $1,500 for each of the AR-15s. GARCIA also mentioned that he might be able to obtain grenades. GARCIA also told the CI to bring some his motorcycle parts to him.

22

b.    I later met with the CI at a staging location.  I searched the CI and his vehicle and found no firearms.  I equipped the CI with a monitoring and recording device and issued him $3,000.  The CI then drove to SUBJECT PREMISES 2.  The CI met with GARCIA and an unknown white male.  The CI and GARCIA discussed the motorcycle.  The CI then arranged with GARCIA to purchase the two AR-15s.  GARCIA called PRADO and who said he would be there shortly.

b.    The CI and GARCIA got in the CI's car and drove to a motorcycle shop on Barranca and Arrow Highway in Azusa, California.  GARCIA and the CI looked at motorcycle parts for the CI's motorcycle.  The CI and GARCIA then drove back to SUBJECT PREMISES 2.

c.    When the CI and GARCIA returned to SUBJECT PREMISES 2, SUBJECT VEHICLE 1 was parked in front.  GARCIA told the CI that SUBJECT VEHICLE 1 belonged to PRADO.  GARCIA and the CI got out of the CI's car.  GARCIA approached SUBJECT VEHICLE 1 AND spoke to PRADO.  The CI joined GARCIA and PRADO at SUBJECT VEHICLE 1.  GARCIA told the CI that the firearms were in the backseat of SUBJECT VEHICLE 1.  The CI retrieved a large cardboard box from his car and returned to the Denali.

d.    While inside SUBJECT VEHICLE 1, PRADO

23

unzipped a bag and pulled out two AR-15-type rifles and a
.380 caliber pistol.  One of the AR-15-type rifles was in
two pieces ((1) the upper receiver and barrel assembly and
(2) the lower receiver).  PRADO asked the CI if he knew how
to put it together and said you just "snap it in."  PRADO
showed the CI the pistol, but the CI declined to purchase it
at that time.  The CI paid PRADO $3,000 for the two rifles.
The CI put the rifles in the box and put it in his car.

      e.   PRADO drove away.  The CI spoke further with
GARCIA.  The CI then left and met me at a staging location.
The CI gave me an Armalite Eagle Arms Model M15A2 5.56mm
caliber rifle bearing serial number 38818, an Olympic Arms,
model MFR .223 caliber rifle bearing serial number 6009, two
30-round ammunition magazines and 28 rounds of .223 caliber
ammunition.

      f.   I utilized California Department of Motor
Vehicle ("DMV") records to positively identify GARCIA.  DMV
records indicate GARCIA lists SUBJECT PREMISES 2 as his
residence.

    27.   On February 24, 2009, I conducted an undercover
operation to purchase firearms.  Based on review of the
recording, my observations, conversations with other
involved agents and a debrief of the CI, I learned the

24

following:

      a.   The CI told me that GARCIA had called him and told him that PRADO had firearms for sale. The CI agreed to meet GARCIA at GARCIA'S at SUBJECT PREMISES 2.

      b.   I met with the CI at a staging location. I searched the CI and his vehicle and found no firearms. I equipped the CI with a monitoring and recording device. I issued the CI $2,100 in funds.

      c.   The CI drove to SUBJECT PREMISES 2 and met with GARCIA and another person known as "Mike." The CI, GARCIA, and Mike discussed motorcycles and motorcycle gangs.

      d.   GARCIA retrieved a small gun safe and backpack from a motorhome that was parked in the driveway. The backpack was full of ammunition, ammunition magazines, and night vision gear. GARCIA opened the gun safe and showed the CI three pistols. GARCIA told the CI that PRADO would have two more firearms.

      e.   At one point, a Chevrolet Tahoe arrived at SUBJECT PREMISES 2. A white male got out of the Tahoe, met with GARCIA and left. GARCIA told the CI that the person in the Tahoe had four firearms, an AR-15-type, an SKS-type, and two shotguns, for sale.

      f.   Later that evening, PRADO arrived in SUBJECT

VEHICLE. 1.  PRADO had two more pistols.  PRADO, GARCIA and
the CI discussed prices for the firearms and ammunition.
GARCIA and PRADO wanted $2,400 for the five handguns.  The
CI paid them $2,100 and agreed to pay the rest later.  PRADO
said he wanted $800 for the bag of ammunition.  The CI said
it was too much and declined to buy it.

       g.    The CI then returned to meet me at the
staging location.  The CI gave me a Tanfoglio model Witness
P .45 caliber pistol bearing serial number EA01155, a
Tanfoglio model EA .380 caliber pistol bearing serial number
EA20334, a Bersa model 383a .380 caliber pistol bearing
serial number 248032, a Ruger model Single Six .22 caliber
revolver bearing serial number 435296, a Taurus, unknown
model, .38 caliber revolver bearing serial number 1814716,
and seven rounds of .380 caliber ammunition.  The CI also
returned the monitoring and recording device.

28.  On February 25, 2009, I met with the CI to follow
up on GARCIA'S statement that the person in the Tahoe had
four firearms for sale.  Based on review of the recording,
my observations, conversations with other involved agents
and a debrief of the CI, I learned the following:

       a.    I directed the CI to call GARCIA, and
monitored the call.  GARCIA told the CI that it would be

several hours before those firearms would be available.
However, GARCIA told the CI that PRADO had nine firearms for
sale for $2,800.  The CI told GARCIA he would meet him at
his house in a few minutes to discuss the purchase.

      b.   I searched the CI and his vehicle and found
no firearms.  I equipped the CI with a monitoring and
recording device and issued him $2,800 in funds.  The CI
drove to SUBJECT PREMISES 2 and met with GARCIA.  GARCIA
told the CI they had to go to GARCIA'S other house to pick
up some parts.  GARCIA drove them in GARCIA'S Ford pickup.
GARCIA talked about motorcycle gangs.  GARCIA told the CI
that he had access to a "Streetsweeper" firearm for $1,500.
During the drive, GARCIA received a call from PRADO and
arranged to meet at PRADO's house, SUBJECT PREMISES 1, to
pick up the firearms.  GARCIA also said he had access to C-4
explosive.

      c.   GARCIA drove to 204 North Delay Street,
Covina, California.  GARCIA stated this house was owned by
his mother.  CI stated they drove to the house to pick up
some motorcycle parts.  CI GARCIA used the garage of the
house to store parts.  GARCIA and the CI left and drove to
SUBJECT PREMISES 1.  PRADO came to GARCIA'S car and put a
box of firearms into the truck.  GARCIA then drove to

27

SUBJECT PREMISES 2. GARCIA then put the firearms in the CI's vehicle.

d. GARCIA, PRADO, the CI, and an unknown Hispanic male met in the garage of SUBJECT PREMISES 2. PRADO told the CI that he had someone who could take firearms to Mexico, that his "crew" takes firearms to Mexico weekly, and that his "crew" does all kinds of "jobs." CI asked PRADO about Santoy and PRADO replied if Santoy owed him "twenty thousand he would be gone" ( meaning if Santoy owed him $20,000 he would have Santoy killed).

e. The CI and PRADO walked to the CI's car and looked at the firearms. The CI only saw seven firearms. After GARCIA came to the CI's car, they agreed that the $2,800 price would cover the seven firearms and the outstanding balance from the last transaction, and GARCIA and PRADO would owe the CI a firearm.

f. The CI then left and drove back to the staging location. The CI gave me two Remington, model 13T and 14,.22 caliber rifles bearing no serial numbers, a Marlin Model 39A .22 caliber rifle bearing serial number J12996, a Harrington and Richardson model Huntsman .45 caliber rifle bearing serial number AJ268794, a Ruger model Mark I .22 caliber pistol bearing serial number 11-02307, a

Ruger, unknown model .22 caliber pistol bearing serial

number 113437, and a Ruger model Single Six .22 caliber

revolver bearing serial number 506422.  The CI also returned

the monitoring and recording device.

29.  On March 11, 2009, I conducted an undercover

operation to purchase firearms.  Based on review of the

recording, my observations, conversations with other

involved agents and a debrief of the CI, I learned the

following:

a.  On March 6, 2009, while the CI and GARCIA

were at SUBJECT PREMISES 2, GARCIA told the CI that he had

five firearms for sale.  The CI had agreed to purchase them

the following week.

b.  On March 11, 2009, I met with the CI at a

staging location.  I searched the CI and his car and found

no firearms.  I equipped the CI with a monitoring and

recording device and issued him $1,000 in funds.  The CI

drove to SUBJECT PREMISES 2.  The CI and GARCIA drove to a

motorcycle shop to buy a part and returned to SUBJECT

PREMISES 2.

c.  The CI agreed to follow GARCIA to another

house where the firearms were.  The CI paid GARCIA $1,000

for the firearm now, and agreed to pay the balance later.

29

GARCIA re-entered his Ford pickup and the CI entered his vehicle.  The CI followed GARCIA to a house in Glendora.

d.   GARCIA retrieved a blanket from a truck that was parked in the driveway.  GARCIA gave the blanket to the CI, and the blanket contained firearms.  The CI put the blanket of firearms into his car.  The CI noticed that "Mike" appeared to live at this house.

e.   The CI drove back to the staging location. The CI gave me a Mauser model Sabre 12-gauge shotgun bearing serial number M29477, a model R310AB 12-gauge shotgun of unknown manufacture bearing serial number G085933, a Winchester model Defender 12-gauge shotgun bearing serial number L815968, a Norinco AK-47-type model MAK 90 Sporter 7.62mm caliber rifle bearing serial number 9421951, and a SWD model Streetsweeper 12-gauge, destructive device bearing serial number 8063.  The CI also returned the monitoring and recording device.

f.   Agents and officers then established surveillance at SUBJECT PREMISES 1.  PRADO was observed entering a green Toyota, bearing California License Plate 5ZPP661.  The Azusa Police Department conducted a traffic stop on this vehicle based on numerous California Vehicle Code Violations.  PRADO was identified as the driver of the

30

vehicle.

g.   Utilizing the records from the California Department of Motor Vehicles I was able to positively identify PRADO as the person known as "Primo".   Additionally the address listed with DMV is SUBJECT PREMISES 1.

h.   On June 8, 2009 an ATF Firearms Technology Branch Firearms Enforcement Officer examined the Street Sweeper and determined that as per Title 26 United States Code 5845(f), the Street Sweeper Shotgun is considered a "destructive device" because it has a bore of greater than ½ inch and is not generally recognized as a sporting firearm.

30.   On April 2, 2009, I conducted an operation to purchase a firearm.   Based on review of the recording, my observations, and conversations with other involved agents and a debrief of the CI, I learned the following:

a.   On April 2, 2009, I instructed the CI to arrange a meeting with GARCIA and PRADO.   I met with the CI at a staging location.   I searched the CI and his car and found no firearms.   I equipped the CI with a monitoring and recording device.

b.   The CI met with GARCIA at SUBJECT PREMISES 2 to discuss his motorcycle and to arrange to meet with PRADO about purchasing more weapons.

31

c.   GARCIA told the CI that PRADO would not be around for a hour.  The CI left SUBJECT PREMISES 2 and was followed to a predetermined meet location.  The CI left because the CI did not believe PRADO would be arriving that evening.

31.  On April 14, 2009 the CI contacted me and stated that GARCIA had told the CI that PRADO had several firearms for sale.  GARCIA told the CI that PRADO would call him directly to discuss the purchase.  On this same date PRADO contacted the CI.  Based on conversations with the CI, I learned the following:

a.  PRADO stated that he had two AK-47 machine guns, two semi automatic AK-47's and a UZI machine gun for sale.

b.  PRADO stated the fireams would cost $1300.00 each.

c.   PRADO assured the CI that the firearms were fully automatic.

d.   CI stated he would arrange to purchase them on a later date.

e.   PRADO stated that he had a secret compartment hidden in the dashboard of SUBJECT VEHICLE 1.  PRADO further stated that he could fit a firearm and five pounds of

32

methamphetamine in the secret compartment.

32. On April 15, 2009, I conducted an operation to purchase a firearm. Based on review of the recording, my observations, and conversations with other involved agents and a debrief of the CI, I learned the following:

a. On April 15, 2009, I instructed the CI to contact GARCIA and arrange the purchase of the firearms discussed on April 14, 2009.

b. I met with the CI at a staging location. I searched the CI and his car and found no firearms. I equipped the CI with a monitoring and recording device and issued him $4050.00 in funds.

c. The CI met GARCIA at SUBJECT PREMISES 2. GARCIA called PRADO for directions and told the CI to follow him.

d. The CI then followed GARCIA in the CI's vehicle to Velasquez Towing and Auto located at 19530 East Cypress Avenue Covina, California. GARCIA spoke with PRADO in the parking lot of the business then approached the CI's vehicle. GARCIA stated the firearms could not be purchased for twenty minutes.

e. GARCIA returned to SUBJECT PREMISES 2 and the CI waited in the area of the business. GARCIA returned

33

approximately thirty minutes later and instructed the CI to follow him into the parking lot of the business.

> f.    The CI then parked his vehicle in the lot of the tow yard. CI paid GARCIA $4050.00 for the firearms.   Two Hispanic males in mechanics uniforms retrieved the firearms from a Volkswagen Rabbit parked in the lot of the tow yard.

> g.    GARCIA then instructed the CI to move his car because it looked suspicious the way it was parked.   The Hispanic males then placed the firearms in the CI's vehicle.

> h.    The CI then drove back to the staging location and gave me a Chinese made model AK-47 machine gun, 7.62 caliber rifle serial number 8414837 with a 30 round magazine; a Ewbank manufacturing, Model EMAKM, 7.62 caliber AK-47 type rifle with an obliterated serial number and 30 round magazine; AA Arms, TEC 9 type 9 millimeter caliber model AP9 serial number 033237; and six rounds of 7.62 Fiocchi Ammunition.

> i.   On June 8, 2009 an ATF Firearms Technology Branch Firearms Enforcement Officer examined the Chinese made AK-47 and determined that as per Title 26 United States Code 5845(b), the firearm was a machinegun because it could fire automatically more than one shot, without manual reloading, by a single function of the trigger.

34

33.   On April 22, 2009, I conducted an operation to purchase a firearm.  Based on review of the recording, my observations, and conversations with other involved agents and a debrief of the CI, I learned the following:

a.   The CI stated that GARCIA had contacted him and stated he had a machinist who could convert semi automatic firearms to fully automatic.  GARCIA also stated he had photos of several of the firearms the machinist had for sale. I instructed the CI to contact GARCIA to discuss the purchase of these firearms.

b.   I met with the CI at a staging location.  I searched the CI and his car and found no firearms.  I equipped the CI with a monitoring and recording device and issued $500.00 in funds.

c.   The CI met with GARCIA at SUBJECT PREMISES 2. The CI paid GARCIA $500.00 for work done on his motorcycle. GARCIA stated he did not have the photos to show the CI.

d.   CI 580 left SUBJECT PREMISES 2 and observed PRADO standing in front of his house at SUBJECT PREMISES 1.

e.   CI 580 asked PRADO about purchasing methamphetamine.  PRADO stated that he usually deals in pounds.  PRADO stated he picks up two pounds at a time and sells them before he picks up another two.  PRADO told the

35

CI to call him to arrange a future purchase.  The CI then
drove back to the staging location.

34.  On April 23, 2009, I conducted an operation to
purchase a firearm.  Based on review of the recording, my
observations, and conversations with other involved agents
and a debrief of the CI, I learned the following:

a.   On April 23, 2009, I instructed the CI to
contact PRADO and arrange a meeting to discuss the purchase
of narcotics with PRADO.

b.   I met with the CI at a staging location.  I
searched the CI and his car and found no contraband.  I
equipped the CI with a monitoring and recording device
device, which did not produce a recording.

b.   PRADO instructed to meet him at Cocoon's
gentlemen's club located at 1580 Clark St., Arcadia
California.  PRADO arrived in SUBJECT VEHICLE 1.

c.   PRADO and the CI met inside Cocoon's.  PRADO
told the CI he worked for "La Familia," a narcotics cartel
Operating out of Michoacan, Mexico.  PRADO stated he was in
charge of all the methamphetamine sales from Azusa to West
Covina California.  PRADO stated a pound of methamphetamine
sells for $16,000.00 per pound.  PRADO stated that while in
Mexico he committed several murders for the Cartel.  PRADO

told the CI that he is looking for people to hire to kill

people for the cartel that live in Southern California.

PRADO told the CI that the CI could make $5,000.00 for each

murder he committed for the cartel. PRADO told the CI that

he owned a landscaping business and that the CI should get a

business to avoid suspicion by the police. PRADO told he CI

to call him when he wanted to purchase the narcotics.

     d.    PRADO and the CI departed the location and

the CI then drove back to the staging area and returned the

monitoring and recording device.

    35.  On May 21, 2009, I conducted an operation to

purchase a firearm. Based on review of the recording, my

observations, and conversations with other involved agents

and a debrief of the CI, I learned the following:

     a.    On May 21, 2009, I spoke with the CI who

stated GARCIA contacted the CI about firearms he had for

sale. GARCIA instructed the CI to go to SUBJECT PREMISES 2

that night and GARCIA would give the CI directions to the

location of the firearms.

     b.    On this same date I met with the CI at a

staging location. I searched the CI and his car and found

no contraband. I equipped the CI with a monitoring and

recording device and issued the CI $2700.00 in funds.

c.   The CI met with GARCIA at SUBJECT PREMISES 2.
GARCIA gave the CI directions to a guy named "Steve" (Later
identified as Steven BLANKS).

d.   The CI then drove to SUBJECT PREMISES 3, where
the CI met BLANKS.  BLANKS brought the CI through the house
and to the garage.  In the garage BLANKS showed the CI
several firearms placed on a table.

e.   BLANKS showed the CI a FAL .308 Assault Rifle
that BLANKS said was a machine gun. BLANKS told the CI the
"clip" holds thirty rounds.  BLANKS described the firearm as
"a fucking animal".  BLANKS displayed several firearms
including a shotgun, a .45 caliber pistol, and a Ruger Mini-
14 on a table in the garage.  BLANKS stated that the .45
caliber is a "nice weapon to carry" and that it is the
weapon BLANKS would carry.

f.   BLANKS then took the CI to the rear of the
property where BLANKS stated he had a "Bunker Garage" to
recover an additional firearm and then returned to the
garage.

g.   BLANKS then unwrapped a M-11 type firearm and
showed the CI.  BLANKS said the M-11 firearm had select fire
(indicating it was a fully automatic firearm).

h.   The CI asked if it had a magazine and BLANKS

38

stated "she" did not bring it.  BLANKS then said he would
have his girlfriend go and get the magazine and an
additional firearm from a nearby location.

        i.  An unidentified female was observed exiting
SUBJECT PREMISES 3 and driving to SUBJECT PREMISES 4.

        j.  BLANKS said he liked AK-47 rifles but got in
"trouble" with AK-47's.  I have checked BLANKS' criminal
history and know that he has a federal conviction related to
the possession of a machinegun.

        k.  BLANKS instructed the CI how to use the M-11
type firearm and that it was missing a bolt.  BLANKS stated
he manufactured the M-11 firearm himself and the CI could
buy a bolt on-line very easily.

        l.  BLANKS received a phone call from his
girlfriend who stated she could not find the magazines.
BLANKS said he kept some of his firearms and parts at that
house (SUBJECT PREMISES 4) and would look for it later.

        m.  The CI paid Blanks $2400.00 for the firearms.
BLANKS stated he was going to Arizona next week to buy more
firearms and would try to get the CI a bolt for the M-11.

        n.  The CI then drove back to the staging
location and gave me a Ruger model mini 14 .223 caliber
rifle serial number 8063 and a Cobray M-11 type 9 millimeter

machine gun with no serial number and the monitoring and
recording device.

      o.   On June 8, 2009, an ATF Firearms Technology
Branch Firearms Enforcement Officer examined the Cobray M-11
type 9 millimeter machine gun and determined that as per
Title 26 United States Code 5845(b), the firearm was a
machinegun because it could fire, or could readily be
restored to fire, automatically, more than one shot, without
manual reloading, by a single function of the trigger.

   36.  On June 20, 2009, I met with the CI who stated he
had been invited to a party that was being thrown by PRADO.
On this same date I met with the CI at a staging location.
Based on review of the recording, my observations,
conversations with other involved agents and a debrief of
the CI, I learned the following:

      a. I searched the CI and found no contraband.  I
equipped the CI with a monitoring and recording device.

      b.  CI stated PRADO told him the party was in
Bloomington, California.

      c. CI met with PRADO at the party and discussed
purchasing narcotics.

      d.   PRADO stated that the narcotics were pure.
PRADO said they were made locally and did not come from

Mexico.

e. PRADO told the CI to call him when he was ready to purchase the narcotics.

f. The CI then drove back to the staging location and returned the monitoring and recording device.

37. On July 9, 2009, I conducted an operation to purchase methamphetamine. Based on review of the recording, my observations, and conversations with other involved agents and a debrief of the CI, I learned the following:

a. On July 9, 2009, I spoke with the CI who stated he had been contacted by PRADO and had arranged to purchase of quarter pound of methamphetamine from PRADO for $5400.00.

b. I met with the CI at a staging location. I searched the CI and found no contraband. I equipped the CI with a monitoring and recording device and issued him $5600.00 in funds.

c. The CI and Los Angeles Police Department's Detective C. Mederos (acting in an undercover capacity) then drove to SUBJECT PREMISES 2 and met with GARCIA. The CI paid GARCIA $200.00 for motorcycle repairs. While at SUBJECT PREMISES 2 the CI was contacted by PRADO. PRADO told the CI to park on Bellefant and he would come and pick

41

the CI up.

     d.   A short time later a white SUBJECT VEHICLE 2 arrived driven by PRADO.  The CI then entered SUBJECT VEHICLE 2 and PRADO drove down the street.  PRADO parked and made a phone call inquiring if the person was on his way and told the person delivering the narcotics where PRADO and the CI were parked.

     e.   PRADO stated he had two sources for narcotics but both were the same quality.  PRADO indicated that the narcotics he was selling was his stuff.  PRADO stated it comes in brick with a stamp on it so you are able to tell if it has been opened or not.

     f.   The CI paid PRADO $5400.00 for the narcotics. PRADO separated the money into two piles one with $600.00 and one with $4800.00.

     g.   A green Toyota California License Plate 6CWL550 (Registered to Victor Velasquez) arrived and parked behind PRADO's vehicle.  A Hispanic male later identified as Victor VELASQUEZ exited the Toyota and entered PRADO's vehicle.  PRADO gave VELASQUEZ $4800.00 and told VELASQUEZ he would pay him the rest at PRADO's house, SUBJECT PREMISES 1.  VELASQUEZ handed a baggie containing a white crystaline substance resembling methamphetamine to PRADO.  PRADO

42

checked the substance and gave it to the CI.  VELASQUEZ then
handed the CI additional baggies containing a white
crystaline substance resembling methamphetamine.  (The
contents of these baggies was subsequently tested by the
LAPD Scientific Investigations division who determined that
the substance contained methamphetamine and weighed 111.41
grams.)

   h.  PRADO told the CI to keep a little for
himself.  PRADO said if the people the CI sells the
narcotics to say it was no good then the CI can test the
portion and see for himself.  While PRADO and the CI were in
SUBJECT VEHICLE 2, PRADO activated a hidden compartment in
the center console and told the CI to put the
methamphetamine in the compartment if the police came.
PRADO then dropped off the CI at his vehicle.  The CI then
returned to the predetermined staging location.

   i.  On July 16, 2009, Los Angeles Police
Department Detective C. De La Torre prepared a photo-lineup
containing a photograph of VELASQUEZ.  The CI positively
identified VELASQUEZ from the photograph as the individual
who arrived in the Toyota and delivered the methamphetamine.

   38.  On July 16, 2009, I spoke with the CI who stated
PRADO Contacted him and asked if he would be interested in

helping collect $5,000,000.00 from a person who owes it to
the Cartel. PRADO told the CI he wanted to meet him in
person. On July 17, 2009, the CI arranged to meet PRADO. On
this same date I met with the CI at a staging location.
Based on review of the recording, my observations,
conversations with other involved agents and a debrief of
the CI, I learned the following:

      a.   PRADO instructed the CI to meet him at Max's
a restaurant located on Azusa Ave in Azusa California.

      b.   PRADO stated he was part of the "La Familia"
Cartel.

      c.   PRADO stated a boss in the Cartel known as
"Cuete" had sent a courier to Mexico to transport narcotics.
During the operation the courier was arrested. The courier
then provided information to the Mexican authorities that
led to the arrest of another high ranking cartel member in
Mexico City. "Cuete" now has to pay $3,000,000.00 because
the arrest was a result of his courier.

      e.   PRADO stated "Cuete" lives in Azusa
California and has received word he owes the money. PRADO
asked the CI if he would like to help collect the money and
wanted to meet the CI in person to talk further. PRADO
stated "Cuete" would have $5,000,000 in his house. PRADO

said he was told by Cartel members that "Cuete" has been ordered to pay the money and should be expecting someone to pick it up.

      h.  PRADO was concerned because "Cuete" could just hand them the money or he may try to resist.  In that case PRADO needed someone he could trust to help him.  PRADO stated "Cuete" and his family were well known and would surely pay the money.  PRADO said if the money is not there we will take (kidnap) him and tell his wife to bring them the money.  RADO said the CI would receive a portion of the $500,000.00 they would be paid by the cartel for getting the money.  PRADO told the CI to do surveillance on the house so he can see who lives there and gain information.  PRADO told the CI to come down and he will show he CI the locations. The CI then left returned to the staging location.

      39.  On July 19, 2009, I met with the CI who stated PRADO had instructed the CI to stop by his house at SUBJECT PREMISES 1.  PRADO told the CI he would show him the houses "Cuete" would be at.  On this same date I met with the CI at a staging location.  Based on review of the recording, my observations, conversations with other involved agents and a debrief of the CI, I learned the following:

      a.  I searched the CI and found no contraband.  I

45

equipped the CI with a monitoring and recording device.

       b.    PRADO met the CI outside SUBJECT PREMISES 1 and got into the CI's vehicle.

       c.    PRADO directed the CI to 5609 Rockvale Drive Azusa, California.  PRADO stated that this is where "Cuete" lives.  PRADO stated that "Cuete" was in Washington right now and the house was vacant.  PRADO stated he has sold "Cuete" at least fifteen fully automatic AR-15's in the past.  PRADO then directed the CI to an apartment at 309 N San Gabriel Ave, Azusa California.  He stated the guy in the apartment "burned him last year".  PRADO stated the guy in the apartment had at least 70 or 80 thousand dollars.

       d.    PRADO stated that as soon as "Cuete" gives him the money they are going to let him go. If "Cuete is does not give him the money then he will have to take him (kidnap) until he gives us the money.  PRADO stated "Cuete" is expecting something because he knows he "fucked it up" (the delivery from Mexico of Narcotics).  PRADO said "When you in the game" (Narcotics Trade) you  get charged when you make a mistake.

       e.    The CI inquired how they were going to get the boss of jail in Mexico.  PRADO stated his Uncle was a chief of Police in Michoacan Mexico.  PRADO stated while the

boss is transported a car will be blown up or it will break
down they will kill a couple of guards and then the boss
will escape.  PRADO stated once you escape you come to the
United States with no criminal record and change your name.
PRADO stated that is what they did with his brother.

   f. PRADO stated "Cuete" is not going to be
killed but he has to pay his debt.  PRADO stated they are
going to charge "Cuete" $5,500,000.00 and he is going to pay
the guys who help him collect the case $500,000.00.  PRADO
stated he is going to hold the money until the "boss" is out
of Jail.  PRADO stated there are only two types of people in
Michoacan, La Familia Cartel and the Zetas.  PRADO stated he
is with La Familia.  PRADO explained that the Zetas control
San Luis Rio Colorado to Mazatlan Mexico.  La Familia
controls Tijuana to Michoacan.

  40. On July 29, 2009, I caused the National Firearms
Registration and Transfer Record to be queried.  No
machineguns, destructive devices or other Title 26 firearms
were registered to PRADO, GARCIA, or BLANKS.

  41. On July 29, 2009, I reviewed Garcia's criminal
history and found that he had been convicted of the
following crime:  Receiving Stolen Property in violation of
California Penal Code Section 496, in the Superior Court of

the State of California, County of Los Angeles, case number KA054371 on or about November 1, 2001.

42.   On July 29, 2009, I caused the Federal Licensing System to be queried.   I found out that neither PRADO nor GARCIA has a federal firearms license.

43.   On July 29, 2009, I spoke to ATF Special Agent David Hamilton who is a certified interstate nexus expert. He told me that the Mauser model Sabre 12-gauge shotgun bearing serial number M29477, the Winchester model Defender 12-gauge shotgun bearing serial number L815968, the Norinco AK-47-type model MAK 90 Sporter 7.62mm caliber rifle bearing serial number 9421951, and the SWD model Streetsweeper 12-gauge, destructive device bearing serial number 8063, were each not manufactured in the State of California and based on their recovery in California had traveled in interstate commerce.

## PROBABLE CAUSE FOR PREMISES TO BE SEARCHED
## AND ITEMS TO BE SEIZED:

35.   Based on my training and experience, my review of this investigation, my consultation with other ATF agents, conversations with LAPD Narcotics Abatement Unit and other law enforcement agents, my prior experience serving search and arrest warrants in cases involving firearm and narcotic

traffickers in cases involving firearms and illegal drugs, I know the following:

       a.    Persons who sell firearms often store firearms in their vehicles, residences, attached or unattached garages, storage sheds, back houses and other structures to avoid detection by law enforcement. Such persons also keep personal firearms in their residences or vehicles for protection.

       b.    Persons who sell firearms keep on hand firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts. I think this is particularly true of BLANKS and SUBJECT PREMISES 3 and SUBJECT PREMISES 4 because of BLANKS statements about and deep and abiding interest in firearms.

       c.    Firearms and firearms accessories are things of value that persons keep for long periods of time. Thus, I believe that such items are still likely to be found at each of the SUBJECT PREMISES. Again, I believe that this is particularly true as to BLANKS, SUBJECT PREMISES 3, and SUBJECT PREMISES 4 because BLANKS appears to have a deep and abiding interest in firearms.

       d.    Firearms traffickers maintain records including firearms money ledgers, firearms distribution or

49

customer lists, price lists, firearms supplier lists,
correspondence, notation logs, receipts, journals, books,
pay and owe sheets, telephone records, telephone bills,
address books, bank statements, storage unit receipts, wire
transfer receipts, and other documents or devises noting the
price, quantity, dates, and/or times when firearms were
purchased possessed, transferred, distributed or sold.
These traffickers often maintain these records in their
home, although when necessary, these records may be kept in
the person's vehicle.

        e.  Narcotics traffickers need to keep a supply
of narcotics on hand at all times to service their
customers.

        f.  Methamphetamine is "cooked," often in a small
home based "lab" in a process that uses pseudoephedrine
tablets, acetone, red phosporous, iodine, and sodium
hydroxide.  To "cook" and package the methamphetamine, the
"cooks" need scales, beakers, sifters, jars, and bags.
These substances and tools need to be kept constantly on
hand and need to be bought at stores and transported back to
the home based lab in a car.

        g.  Narcotics traffickers maintain records,
including  narcotics money ledgers, narcotics distribution

or customer lists, telephone and address books and lists, narcotics supplier lists, correspondence, telephone bills, notation logs, receipts, journals, books, pay and owe sheets, records, and other documents or devises noting the price, quantity, dates, and/or times when controlled substances were purchased possessed, transferred, distributed or sold. Narcotics traffickers commonly maintain such books and records where the drug traffickers have ready access to them, such as in their homes and automobiles.

  h.   PRADO was seen leaving from and returning to SUBJECT PREMISES 1 prior to and subsequent to the sale of narcotics. PRADO stated that he would pay VELASQUEZ the remainder of the money for the narcotics at SUBJECT PREMISES 1 and then was followed to SUBJECT PREMISES 1. I believe PRADO keeps monies, narcotics, and other records concering the sale of narcotics at SUBJECT PREMISES 1

  i.   Because PRADO obtained various firearms from SUBJECT PREMISES 1, I believe he must keep records and contact information for all of these firearms, people and locations in his residence, SUBJECT PREMISES 1.

  j.   Because of dealings with GARCIA and Santoy near and at SUBJECT PREMISES 2, I believe that information

51

and records and contact information for all of these firearms and customers will be found at SUBJECT PREMISES 3.

k.    During a conversation with the CI on April 26, 2009, PRADO told the CI that he has a hidden compartment in SUBJECT VEHICLE 1.  During the transaction on July 9, 2009, PRADO activated a secret compartment in SUBJECT VEHICLE 2 and told the CI that he should put the contraband in the compartment if the police stop them.  Becuase PRADO has had secret compartments installed in SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2, I believe that he uses the SUBJECT VEHICLES for his illegal activities and evidence of those activities will be found in those vehicles.

<u>REQUEST FOR NIGHT-TIME SERVICE</u>

44.    Based on my training and experience, conversations with other ATF agents, conversations with other Federal Agents, conversations with local law enforcement officers, prior experience serving firearms and narcotics related search and arrest warrants, I request authorization to execute the search warrants for SUBJECT PREMISES 1, SUBJECT PREMISES 2, SUBJECT PREMISES 3, and SUBJECT PREMISES 4 at any time of the day or night for the following reasons:

a.    PRADO, an occupant of SUBJECT PREMISES 1 is known to carry firearms on his person.  PRADO has told the

CI that he has committed violent crimes including murder.
PRADO has provided fully automatic firearms and other
assault-type rifles on several occasions and I believe that
he has additional firearms.  PRADO has stated that he is a
member of a violent Mexican narcotics cartel that has
committed many acts of violence and has killed police
officers in Mexico.  PRADO has expressed fear that he is
being watched.

       b.    GARCIA, an occupant of SUBJECT PREMISES 2,
has provided numerous machine guns and assault weapons and I
believe that he has more such weapons.  GARCIA has ties to
the Mongols Outlaw Motorcycle Gang, which has a history of
violence against police.  GARCIA is a felon.

       c.    SUBJECT PREMISES 1 and SUBJECT PREMISES 2 are
in close proximity to each other, they are on the same
block.

       d.    BLANKS, an occupant of SUBJECT PREMISES 3,
has an extensive collection of firearms and keeps some of
those firearms in what he calls his "bunker."  I believe
that BLANKS keeps a large cache of ammunition.  BLANKS has
ties to GARCIA, and if the warrants are executed on GARCIA
and PRADO before these warrants are executed, BLANKS may
learn of the warrants and destroy evidence.  BLANKS is a

prior felon with a narcotics conviction and a conviction for manufacturing a machinegun.

e.   Because BLANKS has ties to SUBJECT PREMISES 4, if the warrants for SUBJECT PREMISES 1, 2, OR 3, is executed before the search warrant at SUBJECT PREMISES 4, the occupants of SUBJECT PREMISES 4 may have time to hide or destroy evidence.

f.   The Los Angeles Police Department will be executing a state court search warrant in the same neighborhood as SUBJECT PREMISES 1 and SUBJECT PREMISES 2, and will be seeking night-time service as well.  The location of the LAPD warrant is also connected to the Mexican cartel and if the LAPD warrant is executed prior to the search warrants at SUBJECT PREMISES 1 and SUBJECT PREMISES 2, the occupants of the LAPD warrant location may warn the occupants of SUBJECT PREMISES 1 and SUBJECT PREMISES 2.

<u>CONCLUSION</u>

45.  I submit there is probable cause to believe that on February 4, 2009, February 24, 2009, February 25, 2009, April 15, 2009, PRADO committed a violation of Title 18, United States Code, Section 922(a)(1)(a), Engaging in the Business of Dealing in Firearms without a License, and that

on July 9, 2009, PRADO committed a violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), Distribution of at least 50 Grams of a Mixture or Substance Containing Methamphetamine.

46.   I submit there is probable cause to believe that on March 11, 2009, GARCIA committed a violation of Title 18, United States Code, Section 922(g)(1), Felon in Possession of a Firearm.

47.   I submit there is probable cause to believe that on May 21, 2009, BLANKS committed a violation of Title 26, United States Code, Section 5861(d), Possession of a Machinegun.

48.   I submit there is probable cause to believe that on July 9, 2009, VELASQUEZ committed a violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), Distribution of at least 50 Grams of a Mixture or Substance Containing Methamphetamine.

49.   I submit that the items described in Attachment B are evidence of violations of 18 U.S.C. § 922(a)(1)(A), 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine, and 26 U.S.C. § 5861(d), Possession of a Machinegun and will be found at SUBJECT PREMISES 1.

50.   I submit that the items described in Attachment C

55

are evidence of violations of 26 U.S.C. § 5861(d) Possession of a Machinegun and/or Destructive Device, 26 U.S.C. § 5861(e), Transfer of a Machinegun and/or Destructive Device, 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm, 18 U.S.C. § 922(a)(1)(A), Engaging in the Business of Dealing in Firearms without a License, and will be found at SUBJECT PREMISES 2.

51. I submit that the items described in Attachment D are evidence of violations of 26 U.S.C. § 5861(d) Possession of a Machinegun; 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm; 26 U.S.C. § 5861(e) Unlawful Transfer of a Machinegun, and will be found at SUBJECT PREMISES 3.

52. I submit that the items described in Attachment E are evidence of violations of 26 U.S.C. § 5861(d) Possession of a Machinegun; 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm; 26 U.S.C. § 5861(e) Unlawful Transfer of a Machinegun, and will be found at SUBJECT PREMISES 4.

53. I submit that the items described in Attachment F are evidence of violations of 18 U.S.C. § 922(a)(1)(A), 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine, and 26 U.S.C. § 5861(d), Possession of a Machinegun, and will be found in SUBJECT VEHICLE 1.

54. I submit that the items described in Attachment G

are evidence of violations of 18 U.S.C. § 922(a)(1)(A), 21

U.S.C. § 841(a)(1), Distribution of Methamphetamine, and 26

U.S.C. § 5861(d), Possession of a Machinegun, and will be

found in SUBJECT VEHICLE 2.

                                        _____
                                        Jason Van Bennekum
                                        Special Agent
                                        Bureau of Alcohol, Tobacco,
                                         Firearms and Explosives

Subscribed and Sworn to before me
this _30th_ day of July 2009.

_____
UNITED STATES MAGISTRATE JUDGE

EXHIBIT "B"

BP-S187.058  **PROGRESS** REPORT  CDFRM
JUN 98
**U.S. DEPARTMENT OF JUSTICE**                        **FEDERAL BUREAU OF PRISONS**

D-49U

| Institution Name, Address, & Telephone No. Taft Correctional Institution 1500 Cadet Rd.  Taft, CA 93268 (661) 763-2510 | Date: 05-01-2012 |
|---|---|

| **Inmate Reviewed** | | |
|---|---|---|
| Inmate's Signature  *Edgardo Prado Castern.* | Date 05-01-2012 | Staff Signature |

1. Type of Progress Report

Initial       Statutory   Interim        Pre-Release
Transfer                  Triennial      XX Other (legal case)

| 2. Inmate's Name: CASTANEDA, EDGARDO PRADO | 3. Register Number: 56855-112 | 4. Age (DOB): 28 (11-06-1983) |
|---|---|---|

5. Present Security/Custody Level
   LOW/ IN

6. Offense/Violator Offense
   DISTRIBUTION OF METHAMPHETAMINE

7. Sentence
   120 MONTHS; 5 YEARS SUPERVISION; $100.00 FELONY ASSESSMENT.

| 8. Sentence Began: 09-02-2010 | 9. Months Served + Jail Credit: 20 + 398 JCT DAYS | 10. Days GCT/EGT/SGT 108/0/0 |
|---|---|---|
| 11. Days FSGT/WSGT/DGCT 0/0/0 | 12. Projected Release: 04-17-2018 VIA GCT REL | 13. Last USPC Action N/A |

14. Detainers/Pending Charges: BICE DETAINER

15. Co-defendants: REFER TO PSI

For continuation Pages, type on a blank sheet with the Inmate's Name, Register No., and Date and attach to this form. Record Copy - Inmate File; copy - U.S. Probation Office; copy - Parole Commission Regional Office (If applicable); copy - inmate

(This form may be replicated via WP)                 Replaces BP-s187.058 DTD FEB 94

U.S. Department of Justice
Federal Bureau of Prisons

**PROGRESS REPORT**
(continued)

Page 2

CASTANEDA, EDGARDO PRADO     REG # 56855-112     May 1, 2012

16.    INSTITUTIONAL ADJUSTMENT: Inmate Castaneda arrived at Taft Correctional Institution on March 10, 2011. Since his arrival in the unit, he has displayed average institutional adjustment.

A.    Program Plan: At his initial and following program reviews, he was encouraged to participate in correctional counseling, leisure/recreational activities, educational classes, maintain clear conduct, obtain a job assignment, earn good work evaluations, and to complete his financial obligation.

B.    Work Assignment: Inmate Castaneda is currently assigned to unit orderly. He obtains good work evaluations.

C.    Educational/Vocational Participation: Inmate Castaneda completed courses in the Spanish GED program and has taken the GED exam. He will be obtaining a GED certificate upon successful exam results. He is currently enrolled in the Spanish Truck CDL course.

D.    Counseling Programs: Inmate Castaneda has been encouraged to seek correctional counseling as needed.

E.    Incident Reports: He has maintained clear conduct.

F.    Institutional Movement: Inmate Castaneda was initially designated to Taft Correctional Institution and arrived on March 10, 2011. There has been no additional movement to date.

G.    Physical/Mental Health: Inmate Castaneda is assigned as regular duty with no restrictions. He is cleared for food service work. According to his PSI, there is no history of mental health issues. He is favorable and should be considered fully employable upon release.

H.    Progress on Financial Plan: Inmate Castaneda was imposed a financial obligation of $100.00. He completed his obligation through the Inmate Financial Responsibility Program on April 24, 2012.

17.    RELEASE PLANNING: Inmate Castaneda has a possible deportation and will release to BICE. He is ineligible to participate in a Residential Re-Entry Center placement.

A.    Residence:    MICHOACAN, MEXICO

B.    Employment:    To be secured.

U.S. Department of Justice
Federal Bureau of Prisons

PROGRESS REPORT
(continue)

Page 3

CASTANEDA, ERNESTO                    REG # 56855-112                    May 1, 2012

C.    USPO:         **Sentencing District**
                    Loretta S. Martin, CUSPO
                    Central District of California
                    312 N. Spring St. Ste 600
                    Los Angeles, CA 90012
                    213-894-3600

D.    Release Preparation Program: Inmate Castaneda is ineligible to complete the Release Preparation Program prior to his release due to his deportation status.

*     The offender is not subject to notification under 18 USC 4042(b), due to release to a detaining authority.

18.   Prepared by:   _____
                     M. Oliver, Case Manager

19.   Reviewed by:   _____
                     L. Kolb, Unit Manager